**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| NANCY ARSAN, | : | Case No. 3:17-cv-121 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| BETH KELLER, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    <u>Introduction</u>

Plaintiff Nancy Arsan brings this action alleging Defendants violated her constitutional rights, including her Fourth Amendment right against unreasonable searches and seizures; Fifth Amendment right against self-incrimination; Fourteenth Amendment right to equal protection under the law; and her right to due process of law. She further alleges Defendants conspired to deprive her of her constitutional rights. Last, she alleges Defendants Greene County Children's Services, Greene County, Ohio, and Greene County Board of Commissioners failed to properly train and failed to properly supervise their employees.

This case is presently before the Court upon County Defendants' Motion for Judgment on the Pleadings (Doc. #47), Plaintiff's Response (Doc. #49), Defendants'

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Reply (Doc. #53), Defendant Jennifer McDermott's Motion for Judgment on the Pleadings (Doc. #57), and Plaintiff's Response (Doc. #58).

## II.    __Background__

The present case stems from custody disputes concerning Plaintiff's two children—Karson and Kaden.  Plaintiff is of Syrian descent and is a Maronite Christian. (Doc. #1, *PageID* #s 8, 13).  She speaks English and works as an interpreter.  *Id.*

Plaintiff alleges that on April 29, 2015, Defendant Kristi Weber, a caseworker for the Greene County Children's Services Board, pounded on her door, and "[w]hen Plaintiff opened the door, Weber, without a warrant, without consent and without identifying herself, pushed her way into Plaintiff's residence."  *Id.* at 5.  Weber told Plaintiff "there was a report that the Plaintiff was abusing drugs in her home and neglecting her children."  *Id.* at 6.  Plaintiff suggested that one of her son's father had threatened to take their child and "it was probably him who made such a report."  *Id.* When she showed Weber text messages supporting her statement, Weber looked through Plaintiff's other messages without permission.  *Id.*  Weber also began searching Plaintiff's house, going into other rooms and opening a closet.  *Id.*  Plaintiff's two-year-old son, Karson, "was crying and afraid" and "Plaintiff also began to cry because Defendant Weber was upsetting her child, refused to leave and was searching her premises without either a warrant or permission."  *Id.* at 7.  Weber asked about Plaintiff's other son, Kaden, and Plaintiff reported he was with his aunt.  As it turns out, Kaden's aunt is Defendant Jennifer McDermott, a former employee of Greene County Children's

Services, and sister of Kristopher Otto, Kaden's father. *Id.* at 7, 15. Weber then went out to the porch to verify Kaden was with McDermott. *Id.* at 7.

"When Defendant Weber returned[,] Plaintiff again asked Weber to leave but Weber stated that she would not leave until Plaintiff admitted to something or she would do an emergency removal and take Karson immediately." *Id.* Plaintiff did not, and Weber went outside again to call McDermott back. *Id.* Weber then came back inside and "stated that she would not leave until Plaintiff submitted to a drug test[.]" *Id.* Plaintiff said that she would go to Weber's office the next day. *Id.* "Weber refused to leave and began pretending she did not understand Plaintiff's accent[.]" *Id.* at 8. "It was late in the evening and Plaintiff, under duress and to get Weber to leave, admitted to smoking marijuana in the past[.]" *Id.* Weber then "demanded a drug test, [and] [u]nder duress, Plaintiff complied and when asked by Weber, stated that she took Adderall for ADHD[.]" *Id.* Weber "swabbed Plaintiff's mouth and collected the swab but did not seal it, which is against protocol for taking the test[.]" *Id.* "Weber again threatened to immediately take her son if Plaintiff did not agree to a safety plan," and thus, "Plaintiff and her child Karson were placed on a safety plan with her friend Brittany Hunter as the supervisor of the plan[.]" *Id.* Weber told Plaintiff she must report the next day to Greene County Children's Services.

The next day, at Greene County Children's Services, Plaintiff met with Weber, Beth Keller, and Kaden's father, Kristopher Otto (who attended via telephone). *Id.* at 4, 9. "Plaintiff was told that she was acting too emotionally, [] Plaintiff explained that in her culture people express their feelings more openly, [] Defendant Keller told her that

here they could find her crazy for acting in that manner[.]" *Id.* at 10. Plaintiff requested a neutral caseworker but Keller denied her request and named McDermott—without a background check or drug test—the supervisor of the safety plan for Karson. *Id.*

After the meeting, Plaintiff found out that Defendants McDermott, Keller, and Weber had personal relationships and were friends on Facebook. *Id.* Before the meetings that included McDermott, she met with the staff of Greene County Children's Services—without Plaintiff—for about an hour. *Id.*

When Plaintiff's mother arrived from Lebanon, Plaintiff requested that she be named the supervisor of Karson's safety plan. *Id.* After Keller denied her request, Plaintiff told Keller that they took her child without a court order and she planned to hire an attorney. *Id.* at 11. Keller informed her that her mother could not be named supervisor until she found an Arabic interpreter. *Id.* But, "Plaintiff was informed by a friend that Keller's statement was false since an interpreter had already been appointed[.]" *Id.* Plaintiff's mother then became the supervisor of the safety plan for Karson. *Id.* Later, Weber went back to Plaintiff's residence with a police officer. *Id.* She told Plaintiff that she had received "a tip that Plaintiff had violated the safety plan because her mother had taken a nap in the other room[.]" *Id.* Weber "demanded that Plaintiff make Defendant McDermott supervisor of the plan or she would remove Karson, Plaintiff in fear agreed[.]" *Id.* Later, Michael Klumb, Karson's father, became supervisor of the safety plan for Karson. Kaden's father, Kristopher Otto, became supervisor of the safety plan for Kaden. *Id.* at 12.

At some later point, Weber called Plaintiff to inform her that the drug test was positive for high levels of methamphetamines and amphetamines. *Id.* Plaintiff, wanting to discuss these results, went to Greene County Children's Services. *Id.* She was told she could not see Weber without an appointment, and Plaintiff said she would wait. *Id.* After about an hour, "Plaintiff heard the Defendant say to Weber that the foreign lady was still in the waiting room[.]" *Id.* Plaintiff then met with Weber and Keller and requested a copy of the drug test results but they refused to provide her a copy. *Id.* at 12-13.

A few months later, Kelly Mohammad was assigned as Plaintiff's new caseworker. *Id.* at 13. She provided Plaintiff with a copy of the drug test results. *Id.* Later, when Plaintiff confronted Keller about her refusal to give Plaintiff the results, "Keller stated that she had not understood Plaintiff due to her accent." *Id.*

On May 22, 2015, Weber testified at a hearing in the Greene County Juvenile Court that she received a report that Plaintiff was using methamphetamine, physically abusing her children, and "had been seen smoking crack cocaine[.]" *Id.* at 9. Weber indicated that she informed Plaintiff of these allegations when she first visited her home on April 29, 2015. *Id.* She reported Plaintiff's drug test revealed high levels of methamphetamines and amphetamines. *Id.* She further testified that Plaintiff had no criminal record and "noted no concerns regarding the condition of Plaintiff's residence." *Id.* Weber also reported that she had not received the results of Plaintiff's second drug test. *Id.* at 13. Plaintiff's "second drug test was negative and had been with Defendant Greene County Children's Services prior to the hearing[.]" *Id.* Weber "later stated that

the results of this test had been given to the wrong person, [and] Defendant Keller affirmed this statement. *Id.*

After the hearing, temporary custody of Karson Klumb was granted to his father, Michael Klumb. *Id.* Mr. Klumb does not live in Greene County and thus, Greene County Children's Services terminated its involvement with Karson. *Id.* at 14.

On May 29, 2015, Defendant Amy Weinman, Program Resource Manager at Greene County Children's Services, "approved a finding that physical abuse and neglect of Kaden Otto and Karson Klumb was substantiated[.]" *Id.* at 3, 13. Greene County Children's Services filed for custody of Kaden and "gave custody to Kris Otto under their supervision[.]" *Id.* at 14. Plaintiff explained, "Custody actions were filed by the fathers of Kaden and Karson and used information from Defendant Greene County Children's Services to obtain custody of these children[.]" *Id.* at 15.

Greene County Children's Services gave Plaintiff a set of steps to complete to be re-united with her children. *Id.* at 14. One of the steps required a psychological evaluation plus group and individual therapy for two years. *Id.* Plaintiff's psychologist and psychiatrist—who she had been seeing for four years—"wrote a letter to [] Greene County Children's Services stating that they had no basis to believe additional therapy was necessary[.]" *Id.* Weber "called the Plaintiff's psychologist to claim that they had not properly diagnosed the Plaintiff and suggest the altering of their diagnosis[.]" *Id.*

During this time period, supervisors of caseworkers at Greene County Children's Services had "Administrative Review meetings" at least weekly. *Id.* The supervisors involved in these meeting include Defendants Amy [Amburn], [Lana] Penney, Joshua

Coomer, and Chad King. *Id.* at 15. They "reviewed and approved the work of Defendants Weber and Keller in Plaintiff's case begun on April 29, 2015[.] *Id.* at 14.

### III.    Standard of Review

Defendants Beth Keller, Kristi Weber, Christina Knowles, Amy Weinman, Amy Amburn, Lana Penney, Joshua Coomer, Chad King, Greene County Department of Job & Family Services, Children Services Division, Greene County, Ohio Board of Commissioners, and Greene County, Ohio (County Defendants) contend that Judgment on the Pleadings is warranted in their favor. (Doc. #47). Defendant Jennifer McDermott also asserts that Judgment on the Pleadings should be granted in her favor. (Doc. #57).

A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. Cleveland Civil Serv. Comm'n,* 946 F.2d 1233, 1235 (6th Cir. 1991); *see Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citations omitted) ("The standard of review for a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted."). "In reviewing the motion, [the Court] must construe the complaint in the light most favorable to the plaintiff, [and] accept all of the complaint's factual allegations as true …." *Hoven v. Walgreen Co.*, 751 F.3d 778, 783 (6th Cir. 2014) (citing *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001)).

Under Federal Rule of Civil Procedure 8, "A pleading that states a claim for relief must contain: … a short and plain statement of the claim showing that the pleader is entitled to relief; and … a demand for the relief sought …." This standard "does not

require 'detailed factual allegations,' but it demands more than an unadorned, the

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129

S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Papasan v. Allain*, 478 U.S. 265, 286, 106

S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim for relief that is plausible on its face.' A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556); *see also Tackett v. M & G*

*Polymers, USA, LLC,* 561 F.3d 478, 488 (6th Cir. 2009) (citation and internal quotation

marks omitted) ("a complaint must contain (1) enough facts to state a claim to relief that

is plausible, (2) more than a formulaic recitation of a cause of action's elements, and (3)

allegations that suggest a right to relief above a speculative level.").

**IV.**    **Discussion**

    **a.**    **Greene County Children's Services Board**

Defendants contend that the Greene County Department of Job & Family Services,

Children Services Division (identified improperly by Plaintiff as Greene County

Children's Services Board) is a branch of the Greene County government and therefore

lacks the capacity to be sued. (Doc. #47, *PageID* #251). Plaintiff agrees that it is a

division of Defendant Greene County, Ohio and under the supervision and control of

Defendant Greene County Board of Commissioners. (Doc. #49, *PageID* #270).

As a branch of the County government, Greene County Children's Services Board lacks the capacity to be sued (*i.e.,* is not *sui juris*). *Adams v. Montgomery Cnty. Children's Servs.*, No 3:15cv127, 2015 WL 4638872, at *3 (S.D. Ohio Aug. 4, 2015) *report and recommendation adopted*, 2016 WL 224096 (S.D. Ohio Jan. 19, 2016) (Rose, D.J.)(citing *Wilson v. Trumbull Cnty. Dep't of Job & Family Servs.*, No. 4:12cv2163, 2013 WL 5820276, at *3 (N.D. Ohio Oct. 29, 2013) (and cases cited therein); *Evans v. Cordray*, No. 2:09cv587, 2012 WL 1021698, at *3 (S.D. Ohio Mar. 26, 2012); *McGuire v. Ameritech Servs., Inc.*, 253 F.Supp.2d 988, 1015 (S.D. Ohio 2003)). Accordingly, Defendant Greene County Children's Services Board must be dismissed as a party.

### b.    Fifth Amendment Claim

County Defendants contend, "Because the allegations in Plaintiff's Complaint do not pertain to criminal proceedings, and Plaintiff has never been compelled to testify as a witness against herself in a criminal proceeding arising out of the instant case, the Court should dismiss Plaintiff's claim under the Fifth Amendment." (Doc. #47, *PageID* #251).

Under the Fifth Amendment, "No person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V.[2] As Plaintiff correctly observes, "the 'Fifth Amendment privilege against compulsory self-incrimination ... *can be asserted in any proceeding,* civil or criminal, administrative or judicial, investigatory or adjudicatory ….'" *Chavez v. Martinez*, 538 U.S. 760, 770, 123 S.Ct. 1994, 2002-03, 155 L.Ed.2d 984 (2003) (plurality opinion) (quoting *Kastigar v. United States*, 406 U.S.

---

[2] The Fifth Amendment is made applicable to the States by the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

441, 444-45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)); *see Lefkowitz v. Turley*, 414 U.S.

70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) ("The Amendment not only protects the

individual against being involuntarily called as a witness against himself in a criminal

prosecution but also privileges him not to answer official questions put to him in any

other proceeding, civil or criminal, formal or informal, where the answers might

incriminate him in future criminal proceedings.").

 Although an individual may assert the privilege in any proceeding, there was in

years past a question of whether an individual "has suffered the requisite constitutional

injury for purposes of a § 1983 action" if the compelled statement is not used in a

criminal case. *McKinley v. City of Mansfield*, 404 F.3d 418, 430 (6th Cir. 2005)

(citations omitted). In 2005, the Sixth Circuit answered that question: "it is now clear

that 'mere coercion does not violate the … Self-Incrimination Clause absent use of the

compelled statements in a criminal case.' It is only once compelled incriminating

statements are used in a criminal proceeding … that an accused has suffered the requisite

constitutional injury for purposes of a § 1983 action." *Id.* (quoting *Chavez,* 538 U.S. at

769; citing *Lingler v. Fechko*, 213 F.3d 237, 238-40 (6th Cir. 2002)).[3]

 In the present case, Plaintiff did make incriminating statements, admitting—

"under duress and to get Weber to leave"—that she had smoked marijuana in the past.

---

[3] In 2015, the Sixth Circuit again examined the Supreme Court's opinion in *Chavez*—this time recognizing the effects of the plurality opinion. *Moody v. Michigan Gaming Control Bd.*, 790 F.3d 669 (6th Cir. 2015). The Court explained that in *Chavez,* the plaintiff answered the police officer's questions, but, in the case before them, the plaintiffs did not answer questions—invoking their rights not to incriminate themselves. *Id.* The Court concluded, "*Chavez* only applies where a party actually makes self-incriminating statements …." *Id.* (internal quotation marks and citation omitted).

(Doc. #1, *PageID* #8).  Plaintiff does not allege, however, that she was prosecuted for a crime or compelled to be a witness against herself in a criminal case.  Accordingly, Plaintiff fails to state a plausible claim under the Fifth Amendment.

###        c.        Due Process Claim

County Defendants assert Plaintiff's due process claim must fail because "her own Complaint establishes that she was afforded a hearing on the custody of her children and that she was represented by counsel.  Further, Plaintiff cannot plead that the County Defendants prevented her from defending herself against the reports of child abuse and drug use."  (Doc. #47, *PageID* #254).

The Fourteenth Amendment provides, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1. The Due Process clause has a substantive component and a procedural component—and Plaintiff claims Defendants violated her right to both.

*Substantive Due Process*

"Substantive due process … serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used."  *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996) (quoting, in part, *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (internal quotation marks omitted)).  Substantive due process claims generally fall under "two categories:  (1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience."  *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 861 (6th Cir. 2012) (quoting *Valot v. S.E. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th

Cir. 1997) (internal quotation marks omitted)).  In the present case, Plaintiff's claim that

her substantive rights as a parent were violated falls under the first type.

Importantly, "Substantive-due-process challenges usually do not survive if a

provision of the Constitution directly addresses the allegedly illegal conduct at issue."

*Smith v. Jefferson Cnty. Bd.*, 641 F.3d 197, 217 (6th Cir. 2011) (citing *Montgomery v.*

*Carter Cnty.*, 226 F.3d 758, 769 (6th Cir. 2000)).

> [T]he Supreme Court has repeatedly cautioned that the concept of substantive due process has no place when a provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff.  *See, e.g., Graham v. Connor,* 490 U.S. 386, 394-95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (concluding that the reasonableness or unreasonableness of force used by police during an investigatory stop or arrest must be analyzed as a Fourth Amendment claim, rather than under "the more generalized notion of 'substantive due process").

*Carter Cnty.*, 226 F.3d at 769.

Plaintiff's claims that Defendants Weber and Keller violated her due process

rights by using "information obtained from an unreasonable search and seizure, [and] a

forced incriminating statement[.]"  The Fourth Amendment specifically addresses

unreasonable search and seizure and the Fifth Amendment specifically addresses self-

incrimination.  Accordingly, these claims must be analyzed under the Fourth Amendment

and Fifth Amendment—not under substantive due process.[4]  *See* Doc. #1, *Page ID #s* 16-

17.

---

[4] In Plaintiff's response, she appears to allege ethnic discrimination also violated her substantive due process rights.  To the extent that is what she is alleging, it must be analyzed in connection with her Fourteenth Amendment equal protection claim.

Plaintiff, however, asserts other violations of her substantive due process rights. And, she correctly observed that parents have a "right to the care, custody, and control of their children." (Doc. #49, *PageID* #272). Indeed, "the Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship." *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006); *see Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) ("it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). However, "the right to family integrity, while critically important, is neither absolute nor unqualified." *Kottmyer*, 436 F.3d at 690 (citing *Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994)). "The right is limited by an equaling compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Kottmyer*, 436 F.3d at 690 (citing *Myers v. Morris,* 810 F.2d 1437, 1462 (8th Cir. 1987)).

In the State of Ohio, "the juvenile court decides whether to grant permanent custody to [the county's department of children and family services] or to grant legal custody to a relative." *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 729 (6th Cir. 2011) (citing Ohio Rev. Code §§ 2151.353(A)(3), 2151.414(A)(1)). In *Pittman,* a father alleged that the county's department of children and family services determined that he was unfit for placement or custody of his child because the social worker mishandled the caregiver approval process and made

detrimental misrepresentations about him in an internal proceeding. 640 F.3d at 729. The Sixth Circuit found that even if the father's allegations were true, "this did not result in the failure to award or to even consider [the father] for placement or custody." *Id.* Although the "caseworker makes an initial determination as to the appropriate placement for a child in CCDCFS custody, that determination is not binding on interested parties, including the parents, until the juvenile court approves and journalizes the child's case plan; if a parent disagrees with the CCDCFS case plan, his recourse is with the juvenile court, which will hear 'evidence on the contents of the case plan' and, 'based upon [that] evidence ... and the best interest of the child, shall determine the contents of the case plan.'" *Id.* (citing Ohio Rev. Code § 2151.412(D)). The Court concluded, "Because the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive [a parent] of his fundamental right. *Id.*; *see also Teets v. Cuyahoga Cnty.*, 460 F. App'x 498, 502 (6th Cir. 2012) ("Because Ohio law refers custody decisions to the juvenile court, which has independent authority to conduct hearings and collect evidence, we held that even intentional misrepresentations by a social worker during an investigation leading up to Ohio custody proceedings do not violate the parent's substantive due process rights because the social worker has no independent ability to institute the alleged deprivation.") (citation omitted).

Plaintiff alleges that Defendants Weber and Keller "refused to provide the Plaintiff with the results of her drug tests, most notably the clean test obtained by Defendants prior to the May 22, 2015 custody hearing, placed persons in the positions of safety plan supervisors without following protocols, removed Plaintiff's children through

intimidation and coercion and attempted to interfere with the reporting of the Plaintiff's psychologist to deprive the Plaintiff of her children ...." (Doc. #1, *Page ID* #18). However, because these matters are pertinent to Plaintiff's custody rights and because Defendants Weber and Keller have "no independent ability" to deprive Plaintiff of her children, Plaintiff's allegations are insufficient to state a plausible due process claim against these Defendants.

*Procedural Due Process*

"The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard 'in a meaningful manner.'" *Grinage*, 82 F.3d at 1349 (quoting *Loudermill v. Cleveland Bd. of Educ.*, 721 F.2d 550, 563 (6th Cir. 1983)). "To establish a procedural due process claim, a plaintiff must show that (1) [she] had a life, liberty, or property interest protected by the Due Process Clause; (2) [she] was deprived of this protected interest; and (3) the state did not afford [her] adequate procedural rights. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (citing *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)). "A procedural due process limitation ... does not require that the government refrain from making a substantive choice to infringe upon a person's life, liberty, or property interest. It simply requires that the government provide 'due process' before making such a decision." *Grinage*, 82 F.3d at 1349 ("The goal is to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the individual affected has a participatory role in the process.").

In the present case, the parties do not dispute the first and second elements. At issue is whether Plaintiff was afforded adequate due process. Plaintiff maintains, "While it is true that the Plaintiff was given a hearing concerning the custody of her child, this hearing was hardly a fair or meaningful hearing and was tainted by the use of material in the testimony of Kristi Weber obtained by an illegal entry into the Plaintiff's home and by coercion …." (Doc. #49, *PageID* #274). Further, Plaintiff claims the results of the second drug test were withheld, Defendant Weber violated protocol in obtaining the first drug-test swab, and Defendant Weber's actions were under the direction of and in collaboration with Defendant McDermott. *Id.*

Plaintiff's argument fails because, as explained in more detail above, "placement determinations are the province of the juvenile court. …" *Pittman*, 640 F.3d at 730. In *Pittman,* the Court found that the social worker's mishandling of the caregiver approval process and the social worker's interference with the parent's right to notice of the custody proceedings did not violate the parent's procedural due process rights. *Id.* The Court stressed that the social worker "is not responsible for any deficiencies in [the child's] custody proceedings before the juvenile court, and she has not violated [the parent's] procedural due process right to those proceedings." *Id.*

In the present case, Plaintiff acknowledges that she had a hearing prior to her deprivation. And, like the parent in *Pittman,* she was represented by counsel at the hearing. *Id.* at 730 ("the fact that Pittman had his own counsel implies that the fairness of the underlying juvenile court proceedings was not compromised." (citing *Lassiter*, 452 U.S. at 27 ("If, as our adversary system presupposes, accurate and just results are most

likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal."). According, Plaintiff's procedural due process claim fails.

### d. Equal Protection Claim

County Defendants assert, "Plaintiff fails to plead that her rights under the equal protection clause were violated, and the Court should dismiss this claim against the County Defendants." (Doc. #47, *PageID* #258).

Under the Fourteenth Amendment's Equal Protection Clause, "No State shall … deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. Amend. XIV. "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 299 (6th Cir. 2006)); *see Raymond v. O'Connor*, 526 F. App'x 526, 530 (6th

Cir. 2013) ("'The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers.'") (quoting *Scarbrough v. Morgan Cnty.*, 470 F.3d 250, 260 (6th Cir. 2006)).

Defendants assert that Plaintiff's equal protection claim fails because she did not "identify any similarly situated, Caucasian, individuals who were treated differently by the County Defendants." (Doc. #47, *PageID* #247). But, Plaintiff disagrees—

> Defendants make much of the terms "similarly situated persons" and go to great lengths trying to turn the Equal Protection Clause into a search for identical twins. Similarly situated persons in this instance are mothers, plain and simple: mothers. Are other clients of the Defendants referred to as "the foreign lady"? Are other mothers claimed to be unable to be understood to avoid providing documents and relevant information although the facts demonstrate a professional facility with English on the part of the Plaintiff? Are other mothers told that if they act according to their cultural norms and backgrounds that they could be found "crazy"? …

(Doc. #49, *PageID* #276). These questions, however, are not for the Court or Defendants to answer: "In making an equal protection challenge, the *plaintiff must demonstrate* that a discrimination of some substance has occurred which has not occurred against other individuals who were similarly situated." *Hall v. Callahan*, 727 F.3d 450, 457 (6th Cir. 2013) (emphasis added) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

Plaintiff alleges in her complaint: "Defendants Weber, Keller, and Receptionist Christina (Last name unknown) discriminated against the Plaintiff based upon her

ethnicity and race in their interactions with and the reports generated by them for Defendant Greene County Children's Services, thereby violating the Plaintiff's Fourteenth Amendment right to equal protection under the law[.]" (Doc. #1, *PageID* #s 18-19).

Notably, Plaintiff does not allege in her complaint that she was treated differently from other mothers or other individuals who are similarly situated to her. Nor can a reasonable inference of such arise from the facts alleged in her Complaint. To the extent that she now claims that Mr. Otto, Mr. Klumb, Ms. McDermott, and Ms. Hunter are similarly situated, her argument fails because Plaintiff does not allege any of them were being investigated for drug use and neglect of their children. "Courts do not require 'exact correlation' when evaluating whether parties are similarly situated, but they do demand 'relevant similarity.'" *Ryan v. City of Detroit*, 174 F. Supp. 3d 964, 976 (E.D. Mich. 2016), *aff'd sub nom. Ryan v. City of Detroit*, 698 F. App'x 272 (6th Cir. 2017) (citing *Loesel*, 692 F.3d at 462; *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)).

In Plaintiff's response, she asserts that "non-Middle Eastern, white persons were treated differently than the Plaintiff and her mother." (Doc. #49, *PageID* #s 275-76). Specifically, several individuals—all of whom are both Caucasian and American—were named supervisor of the safety plans for one or both of Plaintiff's children without background checks: Brittany Hunter, Doc. #1, *Page ID* #s 8-9, ¶¶53-55; Jennifer McDermott, *id.* at 10, ¶¶73-75; Michael Klumb, *id.* at 12, ¶¶87-89; and Kris Otto, *id.* at 12, ¶¶90-92. By comparison, when Plaintiff's mother arrived from Lebanon and Plaintiff

requested she be named the supervisor of the safety plan for Karson, Defendant Keller initially denied her request. *Id.* at 10-11, ¶¶76-77.

Plaintiff also claims in her response that her mother was similarly situated:

> Obviously, Plaintiff's mother, was similarly situated as a relative of the children for the supervisor of the children's safety plan, except she was an Arab. Thus, she was treated differently and other white, non-Arab relatives of the children were given preference. Therefore, the Plaintiff was denied the ability to have a relative from her family as supervisor and that right was given to the members of the father's side of the family based on ethnicity as the actions of the caseworkers demonstrate.

(Doc. #49, *PageID* #276).

There are three errors in Plaintiff's analysis. First, Plaintiff's Complaint does not state or even suggest an equal protection claim based on Defendants' interactions with Plaintiff's mother. *See Robertson v. Lucas,* 753 F.3d 606, 623 (6th Cir. 2014) ("Rule 8 requires that a plaintiff's pleadings 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'") (citation omitted). Second, Plaintiff does not cite any authority for her proposition that she has a right to "have a relative from her family as supervisor." Finally, to extent that Plaintiff is asserting that Defendants violated her mother's right to equal protection, "a 'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Jefferson Cnty. Bd.*, 641 F.3d at 206 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Although this "rule against third-party standing is not absolute[,]" Plaintiff provides no explanation as to why she should be permitted to bring a claim on

behalf of her mother. *Jefferson Cnty. Bd.*, 641 F.3d at 208 (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004)).

Accordingly, Plaintiff's claim under the equal protection clause fails.

### e. Conspiracy

County Defendants and Defendant McDermott contend that Plaintiff failed to state a claim for civil conspiracy under 42 U.S.C. § 1985(3), 42 U.S.C. § 1983, or Ohio law. (Doc. #47, *PageID* #s 258-60); (Doc. #53, *PageID* #s 304-07); (Doc. #57, *PageID* #s 320-28).

Plaintiff broadly describes the alleged conspiracy,

> Defendants Weber and McDermott planned and acted in concert to deprive the Plaintiff of her rights against unreasonable searches and seizures, self-incrimination, and due process of law and committed overt acts of forcible entry, demanding incriminating statements, all based upon false or unverified information and utilized such actions and false and unverified information to coerce the Plaintiff into accepting unjustified safety plan supervisors and the removal and/or change of custody of her children[.]

(Doc. #1, *PageID* #19-20).  She further alleges that Defendants Weinman, Amburn, Penney, Coomer, and King "reviewed the actions of Defendants Weber and Keller on these occasions delineated in [her Complaint] Paragraph 153 and failed to discipline Weber or Keller in any way," *id.* at 20, ¶ 153,[5] and "ratified and endorsed the actions of Defendants Weber and Keller and their plan on these occasions …." *Id.* at 20, ¶154.  It is not clear if Plaintiff intended to allege that these Defendants reviewed the actions of

---

[5] Given that this allegation was made in paragraph 153, Plaintiff presumably intended to refer to paragraph 152.

Defendant Weber and McDermott or if she intended to allege Defendants Weber and

Keller planned and acted in concert.

*42 U.S.C. § 1985*

To state a claim for conspiracy under § 1985(3), a plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Center for Bio–Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir.

2007) (citing *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003)).  Additionally, "[t]he

Supreme Court requires that § 1985 claims contain allegations of 'class-based,

invidiously discriminatory animus.'"  *Webb v. United States*, 789 F.3d 647, 672 (6th Cir.

2015) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338

(1971)).

Plaintiff does not allege that Defendants Weber and McDermott were motivated

by racial or any other class-based animus.  Indeed, in the entire complaint, Plaintiff does

not allege facts reasonably suggesting that there was any "class-based invidiously

discriminatory animus" behind any of Defendant McDermott's actions.  And even if

Plaintiff alleged Defendant Weber acted with discriminatory animus, her conspiracy

claim would fail because she does not allege that Defendant McDermott shared that

animus.  *See Pahssen v. Merrill Cnty.*, 668 F.3d 356, 368 (6th Cir. 2012) ("a plaintiff

alleging a conspiracy to deprive her of her civil rights must establish that the alleged

conspirators shared a common discriminatory objective.") (citing *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)).

*42 U.S.C. § 1983*

To state a claim for conspiracy under § 1983, a plaintiff must allege: "'(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed.'" *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 329 (6th Cir. 2013) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). "Although circumstantial evidence may prove a conspiracy, '[i]t is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983.'" *Gavitt v. Born*, 835 F.3d 623, 647 (6th Cir. 2016) (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011)).

Plaintiff's conclusory allegations are not sufficient plead a plausible § 1983 claim. She does not allege that a single plan existed. Instead, she merely states, "Defendants Weber and McDermott planned and acted in concert …." (Doc. #1, *PageID* #19). Plaintiff's "failure to plead a plan or agreement to violate [her] constitutional rights is fatal to [her] conspiracy claim." *Heyne*, 655 F.3d at 564 (citing *Mettetal v. Vanderbilt Univ.*, 147 F. App'x 577, 585 (6th Cir. 2005) (district court correctly dismissed certain conspiracy claims for failure to allege that the parties had entered into an agreement or formed a single plan)).

*Ohio Law*

Plaintiff also asserts in her Response that she plausibly states a claim of civil conspiracy under Ohio law: "Plaintiff would also point to her jurisdictional statement in which she invokes this Court's supplemental jurisdiction. ..." (Doc. #49, *PageID* #279). "In Ohio, a civil conspiracy consists of the following: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Replogle v. Montgomery Cnty.*, No. 3:09cv102, 2009 WL 1406686, at *6 (S.D. Ohio May 19, 2009) (Rice, D.J.) (citing *Universal Coach v. NYC Transit Auth.*, 90 Ohio App.3d 284, 629 N.E.2d 28 (1993). "Conspiracy claims must be pled with some degree of specificity; vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim." *Replogle*, 2009 WL 1406686, at *7 (citing *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).

Plaintiff contends, "there exists, as pleaded a combination with a malicious purpose (to deprive the Plaintiff of her child), involving at least three (Weber, Keller, McDermott, and also the Defendant supervisors), which resulted in a personal injury, (the loss of her child), and the torts of defamation and misuse of process." (Doc. # 49, *PageID* #280).

Plaintiff does not allege any defamatory statements by Defendants Weber or McDermott. This is a fatal omission because Ohio law requires as an essential element of a defamation claim "'(a) a false and defamatory statement concerning another; …'" *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Akron–Canton Waste*

*Oil, Inc. v. Safety–Kleen Oil Serv., Inc.*, 81 Ohio App.3d 591, 611 N.E.2d 955, 962 (1992)). Nor does Plaintiff allege "misuse of process." "To establish an abuse of process claim under Ohio law, a plaintiff must show that (1) a legal proceeding has been commenced in proper form and with probable cause; (2) the proceeding has been perverted to attempt to accomplish an ulterior motive for which it was not designed; and (3) direct damage has resulted from the wrongful use of process." *Gillman v. Schlagetter*, 777 F. Supp. 2d 1084, 1098 (S.D. Ohio 2010) (Rose, D.J.) (citing *Hahn v. Star Bank*, 190 F.3d 708, 718 (6th Cir. 1999)). Plaintiff does not allege, and the facts do not suggest, that Defendants committed any unlawful act independent from the conspiracy itself. Accordingly, Plaintiff's claim for civil conspiracy under Ohio law fails.

### f.     Failure to Train or Supervise

To succeed on a municipal liability claim under § 1983, a plaintiff "must demonstrate both: (1) the deprivation of a constitutional right, and (2) the [municipality] is responsible for that violation." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996)). County Defendants take issue with the second requirement.

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of. Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official

policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

In the present case, Plaintiff brings both failure to train and failure to supervise claims. For either claim to survive, plaintiff must allege the following: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis*, 455 F.3d at 700; *see Regets v. City of Plymouth*, 568 F. App'x 380, 394 (6th Cir. 2014).

The second requirement—deliberate difference—sets "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 1360, 179 L.Ed.2d (2011) (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)); *see Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) ("To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'") (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Plaintiff alleges that three cases provided adequate notice to the county: "employees of Greene County Children's Services have been sued for racial and ethnic discrimination and irregularities and failure to follow protocols leading to deprivation of Constitutional rights." (Doc. #1, *PageID* #21). These allegations, however, are far too

26

general and conclusory to meet the stringent standard required. *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability."). Further, complaints that "concern unrelated allegations of misconduct" do not support a failure to train or supervise claim. *Smith v. City of Akron*, 476 F. App'x 67, 70 (6th Cir. 2012). It is settled that "[o]nly where a municipality's failure to train its employees *in a relevant respect* evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Plaintiff's conclusory allegations are insufficient to establish a history of abuse or show notice that training in a particular area was deficient. Plaintiff does not explain what allegations of misconduct were alleged in the cases she named or even that the allegations were the same as those alleged by Plaintiff in the present case. The plaintiffs in each case named by Plaintiff appear to be former employees of Greene County Children's Services—unlike Plaintiff in the present case. In *Prado v. Mazeika,* No. 3:16cv320 (S.D. Ohio), the complaint was filed in August 2016—more than one year after the events alleged by Plaintiff in the present case. Because Plaintiff did not adequately allege deliberate indifference, her claims for failure to train and failure to supervise fail.

### g. Qualified Immunity

County Defendants contend that the individual Defendants are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 251 (1982)). "In resolving a government official's qualified immunity claims, [courts] look to whether (1) the facts that the plaintiff has alleged or shown establish the violation of a constitutional right, and (2) the right at issue was 'clearly' established at the time of the alleged misconduct." *Stoudemire v. Michigan Dep't of Corrs.*, 705 F.3d 460, 567 (6th Cir. 2013). "[I]t is generally inappropriate for a district court to grant a 12(b)(6) [or 12(c)] motion … on the basis of qualified immunity. Although an officer's entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point…, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (internal quotation marks and citations omitted)).

For the reasons stated above regarding Plaintiff's failure to state plausible constitutional claims, Plaintiff has not alleged facts sufficient to state a claim for violation of her Fifth Amendment right against self-incrimination; her Fourteenth Amendment right to equal protection under the law; or her right to due process of law. *See supra* §§ IV(b)-(d).

This leaves Plaintiff's unreasonable-search claim. Plaintiff does not allege any direct involvement of Defendants Keller, Weinman, Amburn, Penney, Coomer, and King. Instead, she alleges that they "reviewed the actions of Defendant Weber on these

occasions when [she] forcibly entered Plaintiff's residence and failed to discipline Weber in any way[.]" (Doc. #1, *PageID* #16). Plaintiff also claims they "ratified and endorsed the actions of Defendant Weber …." *Id.* at 17. As explained in more detail above, § 1983 liability cannot be premised solely on the theory of *respondeat superior*. *Monell*, 436 U.S. at 691. And, a "mere failure to act" cannot substantiate a § 1983 claim based on a theory of supervisor liability. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). Accordingly, Plaintiff has not stated a constitutional violation; Defendants Keller, Weinman, Amburn, Penney, Coomer, and King are entitled to qualified immunity.

Plaintiff, however, alleged Defendant Weber personally violated her Fourth Amendment right against unreasonable searches. But, Defendants assert that Defendant Weber is entitled to qualified immunity. Once defendants raise qualified immunity, "plaintiff bears the burden of showing that defendants are not entitled to qualified immunity." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citing *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012)). "At the pleading stage, this burden is carried by alleging facts plausibly making out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Id.* (citing *Wesley*, 779 F.3d at 428); *see Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.") (citing *Harlow*, 457 U.S. at 818).

Plaintiff alleges that Defendant Weber "forcibly entered the Plaintiff's residence on April 29, 2015 without a warrant, court order or consent or emergency circumstances and refused to leave although repeatedly asked to do so. Weber searched Plaintiff's residence and opened a closet without consent[,] and on a subsequent occasion again forcibly entered the Plaintiff's premises without a warrant or consent …." (Doc. #1, *PageID* #16).

Plaintiff has adequately asserted a plausible violation of her constitutional right to be free from unreasonable searches. "[A] social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement. This would simply mean that social workers would have to obtain consent, have sufficient grounds to believe that exigent circumstances exist, or qualify under another recognized exception to the warrant requirement before engaging in warrantless entries and searches of homes." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 859-60 (6th Cir. 2012); *see Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013). Defendants do not assert any recognized exceptions to the warrant requirement apply in the circumstances Defendant Weber faced. Viewing the record in the light most favorable to Plaintiff, she has alleged a violation of her Fourth Amendment right to be free from unreasonable searches.

The next question is whether this right was "clearly established in a 'particularized sense.' That is, the right said to have been violated must be defined 'in light of the specific context of the case, not as a broad general proposition.'" *Moseley*, 790 F.3d at 654 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583

(2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272

(2001)). "The plaintiff has the burden of demonstrating that the law was clearly

established at the time of the challenged conduct." *Andrews,* 700 F.3d at 853 (citing

*Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996)).

Plaintiff, rather than pointing to a specific case, asserts:

> What lay person doesn't know that you can't force your way
> into someone's home?  What lay person doesn't know that
> you can't force a person to admit to a crime?  What human
> being doesn't know that you can get a mother to do or say
> anything by threatening to take her children?  These are all
> basic constitutional knowledge.  Barbaric behavior towards a
> mother is just a question of basic human decency.  If a lay
> person would know all of this, what about a supposedly
> trained caseworker?

(Doc. #49, *PageID* #284).  These epistemological musings are unhelpful.  They do

nothing to show it was clearly established at the time of Defendant Weber's actions that

social workers cannot enter a home without a warrant or an exception to the warrant

requirement.

Nonetheless, recent Sixth Circuit case law leans in Plaintiff's favor.  *See Andrews,*

700 F.3d at 865, fn. 7 ("to find a clearly established right, absent extraordinary

circumstances, a district court looks to 'binding precedent by the Supreme Court, its court

of appeals or itself.'") (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171,

1177 (6th Cir. 1988)).  In 2012, the Sixth Circuit—recognizing "the presumption that

state actors are governed by the Fourth Amendment and the sanctity of the home under

the Fourth Amendment—unambiguously found that the Fourth Amendment governs entries and searches of homes made by social workers."[6] *Andrews*, 700 F.3d at 859-60.

In the present case, the events in question occurred on or after April 29, 2015—over two years after the Court's decision in *Andrews.* To that end, *Andrews* would have alerted a reasonable social worker in Defendant Weber's position that the Fourth Amendment applied to her decision to enter Plaintiff's home. *See Bing v. City of Whitehall*, 456 F.3d 555, 571 (6th Cir. 2006); *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 89 L.Ed.2d 271 (1986) (Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

Accordingly, it was clearly established at the time Defendant Weber entered Plaintiff's home that social workers conducting an investigation are subject to the Fourth Amendment's warrant requirement.

**IT IS THEREFORE RECOMMENDED THAT**:

1. County Defendants' Motion for Judgment on the Pleadings (Doc. #47) be GRANTED, in part, as to Plaintiff's first cause of action against Defendants Keller, Weinman, Amburn, Penney, Coomer, and King; and as to Plaintiff's second, third, fourth, fifth, sixth, and seventh causes of action;

---

[6] Although the *Andrews* Court recognized "that the Fourth Amendment's strictures apply to social worker actions," the Court concluded that at the time (2012), "the reasonable social worker faced with the circumstances of this case could not ascertain from clearly established law the legality of her conduct." 700 F.3d at 860-62 (footnote omitted); *see Hall v. Sweet,* 666 F. App'x 469, 479-80 (6th Cir. 2016) ("Since then, this circuit has continued to hold that it was not clearly established that the warrant requirement applied to social workers conducting similar investigations prior to the *Andrews* decision, at least through 2011.") (citing *Brent v. Wenk,* 555 F. App'x 519 (6th Cir. 2014); *Barber v. Miller,* 809 F.3d 840 (6th Cir. 2015)).

2.      County Defendants' Motion for Judgment on the Pleadings (Doc. #47) be DENIED, in part, as to Plaintiff's first cause of action against Defendant Weber; and

3.      Defendant Jennifer Otto nka McDermott's Motion for Judgment on the Pleadings (Doc. #57) be GRANTED.


January 31, 2018                         *s/Sharon L. Ovington*
                                        Sharon L. Ovington
                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).